**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VENABLE LLP | * |
| 575 7th Street, N.W. | |
| Washington, DC 20004 | * |
| | |
|       Plaintiff | * |
| | |
|    v. | * |
| | |
| OVERSEAS LEASE GROUP, INC. | *   No.:  1:14-CV-2010 |
| 1719 State Route 10 | |
| Suite 235 | *   Judge: |
| Parsippany, NJ 07054 | |
| | * |
| SERVE ON: | |
| | * |
| DELAWARE BUSINESS | |
| INCORPORATORS, INC. | * |
| 3422 Old Capital Trail | |
| Suite 700 | * |
| Wilmington, DE 19808 | |
| | * |
|    and | |
| | * |
| ERNEST GEORGE BADCOCK III | |
| 18 Mark Twain Drive | * |
| Morristown, NJ 07960 | |
| | * |
|      Defendants | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>COMPLAINT</u>

Venable LLP, a Maryland limited liability partnership ("Venable"), by its

undersigned counsel, hereby sues Overseas Lease Group, Inc. ("OLG"), and Ernest

George Badcock III ("Badcock"), and for its Complaint alleges as follows:

### Nature of Action

1.      This action seeks to collect more than $300,000 in attorneys' fees and costs OLG owes to Venable for legal services Venable provided to OLG. Although Venable fully performed all legal services OLG requested and has properly invoiced OLG for those services and related costs, OLG has wrongfully failed and refused to pay Venable for its services and costs. This action also asserts a fraud claim against both OLG and Mr. Badcock, who as President and Chief Executive Officer acting on behalf of OLG, fraudulently induced Venable to agree to substitute its appearance for another law firm's in a matter pending before the Court of Federal Claims (the "COFC Matter").

2.      Having fired its predecessor law firm in the COFC Matter after failing and refusing to pay substantial attorneys' fees and expenses due and owing to that law firm, and then having lied to Venable about the reason for firing the predecessor law firm, OLG did the same to Venable: OLG caused Venable to expend substantial attorney time and incur expenses on OLG's behalf in the COFC Matter, and then, notwithstanding the good result Venable had attained for it, fired Venable after failing and refusing to pay Venable what was due and owing to it.

3.      Then, having already been sued by its predecessor counsel for the attorneys' fees and costs it had failed and refused to pay, OLG decided that offense was the best defense as to Venable; so OLG sued Venable and Venable partner Paul A. Debolt in New York State Supreme Court (the "New York Action"), falsely asserting various wrongs by Venable and Mr. Debolt.

4.     Finding there was "absolutely no nexus to New York in this case. None," the Honorable Shirley Werner Kornreich of the New York State Supreme Court for New York County dismissed the New York Action on November 25, 2014.

**Parties, Jurisdiction, and Venue**

5.     Plaintiff Venable is a Maryland limited liability partnership engaged in the practice of law. Its principal office is located in the District of Columbia. None of Venable's equity partners is a citizen of Delaware or New Jersey.

6.     Defendant OLG is a Delaware corporation in the business of leasing vehicles to United States Government and non-governmental entities around the world. OLG's principal place of business—its self-described "nerve center" and "main operational office"—is located at 1719 State Route 10, Suite 235, Parsippany, New Jersey 07054.

7.     Defendant Badcock is the President and Chief Executive Officer of OLG. On information and belief, Mr. Badcock is a domiciliary of New Jersey, residing at 18 Mark Twain Drive, Morristown, New Jersey 07960.

8.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and this civil action is between citizens of different States.

9.     The Court has personal jurisdiction over Defendants under D.C. Code § 13-423(a)(1) and (3), as Counts 1 and 2 of this Complaint arise from OLG's transaction of business in the District of Columbia, and Count 3 arises from tortious injury Defendants caused in the District of Columbia by acts or omissions in the District of Columbia.

8800086_1

10.     Defendants purposefully availed themselves of the privilege of conducting activities within the District of Columbia by, among other things, interviewing and hiring counsel in the District of Columbia and instituting and prosecuting litigation against the United States in the District of Columbia. That litigation, the COFC Matter, was styled as *Overseas Lease Group*, *Inc. v. U.S.*, No. 11-123 C (Ct. Fed. Cl.). OLG's representatives, including Mr. Badcock, made numerous trips to the District of Columbia in connection with OLG's retention of Venable and prosecution of the COFC Matter. These included trips to: interview Venable before retention; discuss with Venable, post-retention, the COFC Matter; meet with attorneys from the United States Department of Justice ("DOJ") concerning the COFC Matter; participate in a multi-day mediation process ("ADR") under the auspices of the Court of Federal Claims; and attend depositions. The legal fees and expenses Venable seeks to recover in this action arise from these activities by and on behalf of OLG. Moreover, as described in greater detail below, the fraud that Mr. Badcock perpetrated against Venable on behalf of OLG occurred at Venable's office in the District of Columbia and caused injury to Venable there.

11.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted herein occurred in the District of Columbia.

### Additional Facts Common to All Counts

12.     In September 2012, OLG engaged Venable to provide legal services in connection with the then-pending COFC Matter. OLG later engaged Venable to provide unrelated export-control advice as well.

4

13.     OLG, represented by another law firm, Wiley Rein LLP ("Wiley Rein"), filed the COFC Matter on or about February 28, 2011. Seeking damages in excess of $40.5 million, OLG alleged that the United States Government ("United States" or "Government") breached an indefinite delivery, indefinite quantity contract (the "IDIQ Contract") to lease vehicles to Department of Defense organizations operating in Afghanistan.

14.     Shortly after institution of suit, the Court of Federal Claims, sitting in the District of Columbia, granted the Government's motion to dismiss Count IV of OLG's complaint, which had sought damages in excess of $32.6 million, leaving an amount in controversy of just less than $7.9 million.

15.     Though unknown to Venable at the time, OLG sought to replace Wiley Rein with Venable in September 2012 because OLG was indebted to Wiley Rein in the principal amount of at least $229,000, which it had failed and refused to pay despite Wiley Rein's repeated demands for payment. This was not, however, what OLG told Venable.

16.     Venable's first meeting with OLG occurred on September 10, 2012, when Mr. Badcock and Donna M. Zerbo, OLG's General Counsel, came to Venable's District of Columbia office to discuss Venable's potential representation of OLG in the COFC Matter. At that meeting, Venable partner Paul A. Debolt asked Mr. Badcock and Ms. Zerbo why OLG wanted to change law firms. Mr. Badcock responded that Wiley Rein had engaged in unauthorized discussions with an attorney from the DOJ about settling the COFC Matter, and this was why OLG had decided to replace Wiley Rein.

17.     Mr. Badcock's statement was false. The true reason OLG had sought out Venable was that OLG owed at least $229,000 to Wiley Rein for its legal services. Following a summary judgment in OLG's favor on the Government's liability for breach of contract—the ruling did not address damages—Wiley Rein was demanding payment of the outstanding balance, and OLG did not want to pay. OLG ultimately fired Wiley Rein, not because Wiley Rein had engaged in unauthorized settlement negotiations, but because Wiley Rein had demanded payment, OLG had failed and refused to pay Wiley Rein what it was owed, and OLG had by then, through deceit, convinced Venable to substitute its appearance for Wiley Rein's in the COFC Matter.

18.     Reasonably relying on Mr. Badcock's false statement about why OLG was terminating Wiley Rein and changing counsel, Venable agreed to represent OLG in the COFC Matter. OLG was thus free to fire Wiley Rein, and thereupon did so. Venable substituted its appearance for Wiley Rein's in early October 2012.

19.     On February 15, 2013, Wiley Rein had to sue OLG in D.C. Superior Court to recover the $229,000 OLG owed it. The case, styled as *Wiley Rein LLP v. Overseas Lease Group*, *Inc.*, was assigned to Honorable Laura A. Cordero as Case No. 2013 CA 001358 B. On information and belief, the matter settled before OLG filed an answer.

20.     Venable's standard engagement letter addressed to Mr. Badcock, dated September 29, 2012 (the "First Engagement Letter"), set forth the fee arrangements between Venable and OLG in clear and unambiguous terms, explained Venable's hourly rates, and attached Venable's standard Statement of Billing and Engagement Policies. Those policies address how Venable's fee would be computed, what disbursements (such

6

as on-line research costs, reproduction costs, and travel expenses) would be billed in addition to the fees charged, and how and when OLG was expected to pay amounts due and owing to Venable. In particular, the Engagement Letter provided that payment was due on the client's receipt of a Venable invoice; payment was not contingent or dependent on the outcome of the engagement, such as prevailing in a lawsuit or concluding a transaction; and if an invoice remained unpaid after thirty (30) days, Venable would assess and add to its invoice a carrying charge of fifteen percent (15%) per annum (1.25% per month) on the unpaid balance.

21.     As part of its engagement of Venable to provide legal services, OLG agreed to pay Venable for those services pursuant to the agreed-upon billing arrangements set forth in the Engagement Letter.

22.     From October 2012 through April 2014, Venable provided the legal services requested by OLG and performed work on behalf of OLG in the COFC Matter, including the ADR. Venable fully and properly performed all of these services in accordance with the directions and instructions of OLG. Venable submitted monthly detailed invoices to OLG beginning in October 2012. The invoices state how the time on which Venable bases its fee was spent.

23.     From the outset of Venable's representation of OLG, OLG insisted that Venable pursue the COFC Matter aggressively and instructed Venable to fight the United States at every turn. OLG's conduct of the litigation caused Venable to spend significant time on the COFC Matter, thereby increasing, by OLG's own decisions, the amount of time Venable billed to OLG.

24.     Within six months of Venable's entering its appearance in the COFC Matter, the Government undertook a counteroffensive against OLG.

25.     In late April 2013, the Government issued a "debt determination" seeking prompt reimbursement of approximately $1.3 million in alleged overpayments it had made to OLG. The debt determination arose under the same IDIQ Contract giving rise to the COFC Matter.

26.     When the United States issues such a debt determination, the contractor—in this case, OLG—must either pay within a definite period or convince the United States to stay collection. The Government's issuance of a debt determination also enables the Government to withhold any outstanding payments otherwise due and owing to the contractor as an offset against money the Government claims the contractor owes.

27.     Venable, on behalf of OLG, prepared a response to the Government's debt determination. At the time, OLG was in talks with the U.S. Army Corps of Engineers to settle an unrelated matter in which OLG sought approximately $1.4 million claim. Notwithstanding the Government's right to offset, Venable's response enabled OLG to invoice for the settlement amount and receive payment in December 2013.  As a result of Venable's efforts, the Government did not use the $1.3 million debt determination to avoid paying OLG in settlement of its separate $1.4 million claim.

28.     In addition to the debt determination, the Government also undertook other offensive measures against OLG. Specifically, in June 2013, the Government filed Counterclaims against OLG in the COFC Matter, alleging that OLG had submitted fraudulent invoices to the United States under its IDIQ Contract. These Counterclaims, if allowed, would have resulted in the forfeiture of OLG's entire $7.9

8800086_1

million claim in the COFC Matter, an award of civil damages to the United States equal to the payments it had made to OLG as a result of OLG's fraud, and the assessment of penalties of between $5,500 and $11,000 for each fraudulent invoice OLG had submitted to the United States—all this, while the United States pressed its effort to recover $1.3 million under its debt determination.

29.     Consistent with his directions from the outset, Mr. Badcock instructed Venable to do everything it could to defeat the Government's fraud Counterclaims. At his direction, Venable undertook extensive research and briefing of a motion to dismiss. The parties' combined briefing, which lasted from July 2013 to September 2013, addressed complex constitutional, jurisdictional, and sovereign-immunity issues.

30.     As had been the case throughout the preceding year, Mr. Badcock and Ms. Zerbo were complementary of Venable's work on the motion to dismiss, with Mr. Badcock saying it was legally "on target." Mr. Badcock also said that OLG's self-styled "outside General Counsel," Paul Batista, had reviewed Venable's filings on the motion to dismiss and was so impressed and convinced of their merit that he: (a) insisted Venable seek Rule 11 sanctions against the DOJ's attorneys for filing the fraud counterclaims in the first place; and (b) wanted Venable to file disciplinary proceedings against one DOJ attorney in particular for unethical conduct. Venable undertook neither action urged by Mr. Batista.

31.     The Court of Federal Claims issued a short ruling in mid-December 2013, directing the parties to refile their papers as cross-motions for summary judgment in January 2014.

32.     Given the potential negative consequences of summary judgment in the Government's favor—fraud-based forfeiture would have wiped out OLG's entire $7.9 million claim—as well as the growing cost of the litigation, which was far from over, OLG proposed ADR to the DOJ.

33.     Venable sent a second engagement letter dated April 10, 2014 (the "Second Engagement Letter"), to Ms. Zerbo concerning the ADR process before the Court of Federal Claims. Though it set forth the same Statement of Billing and Engagement Policies as the First Engagement Letter, the Second Engagement Letter provided that Venable had agreed to cap its fees for the ADR at $40,000.00. This was done as an accommodation to OLG, which by the date of the Second Engagement Letter had failed to pay invoices from Venable dated as far back as June 20, 2013, and as of April 10, 2014, already owed Venable a principal amount of $252,302.71 for the COFC Matter and another $10,977.60 for unrelated export-control advice OLG had asked Venable to provide.

34.     The ADR was fact-intensive, as there were twelve distinct claims to address: the remaining three counts of OLG's Complaint; five debt determinations against OLG; and four fraud counts against OLG under the Government's Counterclaims. The ADR lasted three days, but did not resolve the COFC Matter.

35.     Ultimately, OLG authorized Venable to make an offer to the Government to settle the COFC Matter for $4 million. Venable did so, and Civil Division lawyers agreed to recommend acceptance of the offer to their superiors at the DOJ. On June 20, 2014, the parties submitted a Joint Status Report advising the Court of Federal Claims that they had "reached an agreement to recommend settlement to those with

authority to settle this matter"; and that "[t]he process for obtaining settlement authority

in this matter involves the Assistant Attorney General responsible for the Civil Division

formally making a recommendation to the Associate Attorney General after receiving

input from both the Fraud and the National Courts Sections of the Commercial Litigation

Branch."

36.     Less than a month later, before the Government had accepted

OLG's settlement offer, Mr. Batista, OLG's self-styled "outside General Counsel,"

notified Mr. Debolt on July 16, 2014, that Venable was no longer to represent OLG.

37.     After giving OLG notice, Mr. Debolt filed a motion to withdraw as

counsel in the COFC Matter on July 21, 2014. The Court of Federal Claims granted the

motion on August 19, 2014.

38.     On August 7, 2014, while the settlement offer was still under

review at the DOJ and had not yet been consummated, OLG filed suit against Venable

and Mr. Debolt in New York State Supreme Court for New York County, i.e., the New

York Action. The New York Action falsely alleged, inter alia, that a settlement with the

Government had been "reached months" earlier; and that OLG had been damaged by the

defendants' negligence, intentional misconduct, and other wrongdoing; and that OLG had

suffered damages of at least $6 million, representing the difference between the $4

million settlement offer and $10 million, the amount OLG falsely claimed it sought in the

COFC Matter.

39.     On August 20, 2014, counsel for Venable wrote to Mr. Batista,

protesting that "no settlement has been concluded between OLG and the federal

government. The proposed settlement is still before the [DOJ] for consideration and

approval. If, as you assert in the [New York Action] Complaint, OLG is dissatisfied with the settlement, it need only notify the DOJ of its asserted dissatisfaction and revoke or withdraw any offer of settlement. As a matter of law, when an offer of settlement has been made, the offering party may withdraw that offer at any time before acceptance. The DOJ has not accepted any settlement, and OLG is currently under no obligation to settle its claims. Based on the allegations in the Complaint, OLG now has a right and obligation to revoke any offer of settlement and withdraw from the proposed settlement. Indeed, OLG should have taken these steps before filing its baseless lawsuit against Venable and Mr. Debolt."

40.     The same day, Mr. Batista sent a letter stating that the "settlement is final. OLG will not and cannot revoke it." Incredibly, in the same letter Mr. Batista said that if Venable did anything to void or call into question the settlement that allegedly had "damage[d]" OLG, he would amend OLG's complaint in the New York Action "to seek punitive damages," and would "also present appropriate claims for disciplinary action against [Venable] to all appropriate authorities."

41.     Mr. Batista's statement that the "settlement is final" and OLG could not revoke it was false. The Government had not yet accepted OLG's settlement offer. As Mr. Batista's threats on behalf of OLG made clear, OLG did not want to revoke the settlement offer because it knew and understood that the offer, if accepted, would represent a significant victory for OLG.

42.     It was not until September 12, 2014, over a month after OLG had filed the New York Action and over three weeks after Mr. Batista's August 20 letter, that the Government finally accepted OLG's settlement offer. On that date, the Government

and OLG notified the Court of Federal Claims that the United States and OLG had

"finalized and signed the settlement agreement." OLG thus got exactly what it had

wanted.

43.     On November 25, 2014, the Honorable Shirley Werner Kornreich

of the New York State Supreme Court for New York County dismissed the New York

Action under the doctrine of *forum non conveniens*, finding that the New York Action

was an exercise in forum-shopping: "There is absolutely no nexus to New York in this

case. None."

44.     Despite OLG's instructions to fight the DOJ on every issue;

despite OLG's micromanagement of Venable's work, OLG never once criticized the

quality or quantity of Venable's legal work and never once instructed Venable to stand

down. Quite the contrary; at every turn, OLG wanted Venable to do more and more work.

45.     Venable timely submitted invoices to OLG for all legal services

that Venable provided to OLG and costs incurred by Venable in providing those services.

Venable has billed and invoiced OLG for its legal services and costs in accordance with

the billing arrangements agreed upon between Venable and OLG. The outstanding and

unpaid invoices submitted by Venable to OLG fall into the following categories of work:

(1) the COFC Matter; (2) the ADR; and (3) unrelated export-control advice OLG had

asked Venable to provide.

46.     As previously alleged, the total principal amount OLG owes to

Venable is $303,280.31.

47.     In performing the services described above, Venable also incurred

costs totaling $17,035.03, for which OLG agreed to pay Venable. For example, at OLG's

direction, Venable undertook electronic on-line Westlaw® research. The Westlaw® research charges billed to OLG total $10,360.32. Venable also incurred travel expenses to meet with OLG and to conduct discovery. The travel charges billed to OLG total $1,414.37. Venable also incurred internal reproduction costs for which it billed OLG $2,741. OLG has wrongfully failed and refused to pay these and other charges.

### COUNT 1 - Breach of Contract (OLG)

48.     Venable repeats and re-alleges as though set forth in full in this Count 1 the allegations in paragraphs 1 through 47.

49.     Under the contract terms of the engagement under which OLG hired Venable to provide legal services and Venable agreed to provide those services, OLG agreed to and was required to pay Venable the amounts set forth in each invoice for legal fees and disbursements. Copies of all of Venable's monthly invoices were contemporaneously provided to OLG.

50.     OLG has failed and refused to pay the total amount invoiced to it. By failing and refusing to pay the total amount due and owing, OLG has materially breached its contractual obligation to Venable to pay for the legal services Venable provided to OLG.

51.     As a direct and proximate result of OLG's material breach of contract, Venable has been damaged in the principal amount of $303,280.31, plus pre-judgment interest at the rate of fifteen percent per annum (1.25 percent per month) in accordance with Venable's Statement of Billing and Engagement Policies, plus post-judgment interest at the judgment rate allowable under District of Columbia law, plus allowable costs.

14

## COUNT 2 - Quantum Meruit (OLG)

52.     Venable repeats and re-alleges as though set forth in full in this Count 2 the allegations in paragraphs 1 through 47.

53.     By reason of the foregoing, and alternatively, Venable is entitled to recover from OLG the principal amount of $303,280.31 under quantum meruit, such amount representing the reasonable value of the legal services, including costs and disbursements, provided by Venable to OLG.

54.     Venable provided the legal services to OLG with the expectation of payment for such services, including payment of attorneys' fees and costs or disbursements.

55.     OLG requested, received, and accepted the value of Venable's legal services, including the attorneys' fees and costs or disbursements.

56.     Venable has not received full payment for its legal services, including attorneys' fees and disbursements.

57.     As a direct and proximate result of OLG's failure to pay in full for Venable's legal services, including attorneys' fees and costs or disbursements, OLG has been unjustly enriched by the value of such services in the amount of $303,280.31, pre-judgment interest at the rate of fifteen percent per annum (1.25 percent per month) in accordance with Venable's Statement of Billing and Engagement Policies, plus post-judgment interest at the judgment rate allowable under District of Columbia law, plus allowable costs.

### COUNT 3 – Fraud (OLG and Badcock)

58.     Venable repeats and re-alleges as though set forth in full in this Count 3 the allegations in paragraphs 1 through 47.

59.     When Mr. Badcock and Ms. Zerbo first met with Mr. Debolt at Venable's District of Columbia office in September 2012, OLG was still represented by Wiley Rein. In fact, as of September 2012 OLG had, assisted by Wiley Rein, obtained what it has called a "significant summary judgment" in the COFC Matter.

60.     Given these circumstances, Mr. Debolt asked Mr. Badcock why OLG was looking for new counsel.

61.     Mr. Badcock replied that OLG wanted to replace Wiley Rein because Wiley Rein had engaged in unauthorized settlement discussions with a DOJ attorney.

62.     Mr. Badcock's statement was false. OLG was interviewing Venable not because it was dissatisfied with "unauthorized" discussions between Wiley Rein and DOJ attorneys, but because OLG owed Wiley Rein approximately $229,000, Wiley Rein had demanded payment, and OLG, which had failed and refused to pay Wiley Rein, wanted to avoid making payment by firing Wiley Rein and retaining new counsel to prosecute what it perceived to be left of the COFC Matter.

63.     Mr. Badcock knew as of September 10, 2012, that the statement he had made to Mr. Debolt was false; for as of that date OLG had incurred a debt of $229,000 to Wiley Rein and Wiley Rein had made repeated demands for payment.

64.     Mr. Badcock's false statement was material. If he had told the truth when asked—that OLG was interviewing Venable because its then-current counsel,

Wiley Rein, had demanded payment of a sizeable past-due balance and OLG had failed and refused to pay Wiley Rein—Venable would not have agreed to represent OLG.

65. Mr. Badcock made his false statement with the intent to deceive Venable. If he had answered Mr. Debolt's question truthfully, the meeting with Venable would have ended shortly thereafter with the parties going their separate ways.

66. Venable relied on Mr. Badcock's false statement. Under the circumstances, its reliance was reasonable, because it had no reason to believe Mr. Badcock was lying, and Venable could not ask the law firm it might replace if Mr. Badcock was telling the truth.

67. Venable was damaged as a result of its reasonable reliance on Mr. Badcock's knowingly false statement made on behalf of OLG. OLG has done to Venable exactly what it had done to Wiley Rein (only more so): caused its law firm to expend valuable attorney time and incur expenses without payment. As a direct and proximate result of OLG's failure to pay in full for Venable's legal services, including attorneys' fees and costs or disbursements, OLG and Mr. Badcock have damaged Venable in the principal amount of $303,280.31, plus pre-judgment interest at the rate of fifteen percent per annum (1.25 percent per month) in accordance with Venable's Statement of Billing and Engagement Policies, plus post-judgment interest at the judgment rate allowable under District of Columbia law, plus allowable costs.

68. For their reprehensible fraudulent conduct, OLG and Mr. Badcock are liable to Venable for exemplary damages as well.

**WHEREFORE**, Venable LLP requests that this Court enter a judgment in its favor against Overseas Lease Group, Inc., and Ernest George Badcock III as follows:

     a)      Against OLG on Count 1 in the amount of $303,280.31, plus pre-judgment interest at the rate of fifteen percent per annum (1.25 percent per month) in accordance with Venable's Statement of Billing and Engagement Policies, plus post-judgment interest at the judgment rate allowable under District of Columbia law, plus allowable costs;

     b)      Against OLG on Count 2 in an amount equal to $303,280.31, plus pre-judgment interest at the rate of fifteen percent per annum (1.25 percent per month) in accordance with Venable's Statement of Billing and Engagement Policies, plus post-judgment interest at the judgment rate allowable under District of Columbia law, plus allowable costs;

     c)      Against OLG and Mr. Badcock, jointly and severally, on Count 3, in an amount equal to $303,280.31, pre-judgment interest at the rate of fifteen percent per annum (1.25 percent per month) in accordance with Venable's Statement of Billing and Engagement Policies, plus exemplary damages in an amount to be determined at trial, plus post-judgment interest at the judgment rate allowable under District of Columbia law, plus allowable costs; and

     d)      Such other and further relief as may be appropriate.

Respectfully submitted,

Dated: November 26, 2014

_____/s/_____
Andrew Gendron (D.C. Bar #: 471159)
*Agendron@venable.com*
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7439

*Counsel for Plaintiff*