**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VENABLE LLP             *

       Plaintiff           *

   v.                     *

OVERSEAS LEASE GROUP, INC., *et al*.   *      No.: Case 1:14-cv-02010-RJL

       Defendants       *

*     *     *     *     *     *     *     *     *     *     *     *     *

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
COUNTERCLAIMS OF OVERSEAS LEASE GROUP, INC.**

Venable LLP and Paul A. Debolt, Esq., Counter-Defendants (collectively, "Venable"), submit this memorandum in support of their Motion to Dismiss the Counterclaim ("Motion" or "Mot.") (Doc. 15) filed by Overseas Lease Group, Inc. ("OLG").[1]

## I.  Introduction

OLG now appears to concede what Venable said at the outset: "this dispute … is all about legal fees" that OLG does not want to pay. *Compare* Doc. 21 ("Opposition") at 3 *with* Doc. 15-1 at 1. Venable's Motion demonstrates, however, that the desire not to pay a debt due and owing is not enough to give a would-be counterclaimant a cause of action.

OLG's response to the Motion employs a two-pronged strategy. First, it filed an Amended Counterclaim (Doc. 20). Then, it filed an Opposition that attempts to defend the very pleading its Amended Counterclaim superseded.

---

[1]     Capitalized terms, abbreviations, and acronyms used in Venable's Memorandum in Support of Motion to Dismiss ("Supporting Memorandum") (Doc. 15-1) have the same meaning in this Reply Memorandum.

The ostensible purpose of the Amended Counterclaim was to "[a]dd[ ] details that Venable says it needs [to] expedite resolution of this matter." Doc. 21 at 1 n.1. However, filing an amended pleading does not just add detail; it renders the original pleading "a nullity." *McKeithan v. Boarman*, 2011 WL 2669060, *1 (D.D.C. Jul. 7, 2011) (quoting *Wultz v. Islamic Republic of Iran*, 2009 WL 4981537, at *1 (D.D.C. Dec. 14, 2009). While this would ordinarily moot a pending motion to dismiss, *id*., that is not always the case. Where, as here, the amended pleading fails to cure the defects that prompted the motion in the first place, "the court simply may consider the motion as being addressed to the amended pleading." 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1476, at 638 (3d ed. 2010) (citing, e.g., *Jordan v. City of Phila.*, 66 F. Supp. 2d 638, 641 n.1 (E.D. Pa. 1999));[2] *see Sunset Financial Resources*, *Inc. v. Redevelopment Group V*, *LLC*, 417 F. Supp. 2d 632, 642 n.15 (D.N.J. 2006) (collecting cases).

In *Jordan*, for example, since several counts of the amended complaint suffered from the same deficiencies addressed in the defendants' motion to dismiss, the court "allow[ed] the motion to dismiss [those] counts to be considered as addressing the amended complaint." *Jordan*, 66 F. Supp. 2d at 641 n.1 (citing *Patton Elec. Co. v. Rampart Air*, *Inc.*, 777 F. Supp. 704, 713 (N.D. Ind. 1991)). That is the case here as well. Accordingly, the Court should deem the Motion to apply to OLG's Amended Counterclaim.

The Opposition that OLG filed to defend its now-superseded Counterclaim argues that the Court need not worry about examining OLG's pleading for plausibility. That is, it argues that the now-abrogated "no set of facts" formulation of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), is still good law. *See* Doc. 21 at 2 & 8 (citing and quoting *Conley*). As discussed below, this

---

[2]     "To hold otherwise would be to exalt form over substance." 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1476, at 638.

argument lacks merit. *Conley*—at least to the extent of its "no set of facts" formulation—has not been good law since 2007.

OLG has done nothing to address the Motion's argument that Venable had no duty to recover every dime OLG claimed against the Government. It has also failed to address Venable's argument that OLG's own, freely made decision to consummate its settlement with the Government is the sole cause of its alleged damage. And, even though OLG tries to add some respectability to its conclusory allegations of overbilling by attaching a purportedly "independent analysis" (Doc. 20-1) to its Amended Counterclaim, that document adds nothing; it simply parrots (albeit in less aggressive language) the characterizations and labels that are already in the pleading.

The Amended Counterclaim's purported efforts to "[a]dd[ ] details" to its fraudulent-inducement claim, and to insert a negligent-misrepresentation claim, also fail. These two claims rely on mere "puffery," and should, accordingly, be dismissed with the remainder of the Amended Counterclaim, with prejudice.

## II.  The Opposition's Contentions and the Amended Counterclaim

OLG recites ten paragraphs of its now-superseded Counterclaim over nearly a quarter of its Opposition. *See* Doc. 21 at 4-7. It then says that the five claims it asserts "are standard claims in cases where attorneys promise to control costs and are alleged to have failed in their ethical obligation to do that and then to bill only for services actually rendered." *Id*. at 7. Neither the Counterclaim nor the Amended Counterclaim, however, alleges violation of any Rule of Professional Responsibility. Even if they did, the Preamble to D.C.'s Rules of Professional Responsibility states that "[v]iolation of a rule does not necessarily give rise to a cause of action,

nor does it create a presumption that a duty has been violated." D.C. App. R. X, app. A, Scope at 150.

Moreover, the five purportedly "standard" claims that OLG does assert in the Amended Counterclaim are not the same "standard" five that were in the original Counterclaim. Though OLG says that its original Fifth Counterclaim, for "gross overbilling" (Doc. 12 ¶¶ 107-09), "has not been re-pleaded," Doc. 21 at 7 n.5, it does not say that the Amended Counterclaim's Fifth Counterclaim is now a different claim altogether, for negligent misrepresentation. *See* Doc. 20 ¶¶ 115-19. It just tries to slip that claim in over the transom as a "revis[ion]" of the "gross overbilling" claim. *See* Doc. 21 at 1 n.1.

This new Fifth Counterclaim alleges that "Venable and Debolt misrepresented how they would conduct and staff this case if retained by OLG knowing that OLG was highly sensitive to the costs of the litigation," *id*. at ¶ 116; "OLG relied on Venable's and Debolt's false statement or omission was to how [sic] Venable would conduct the litigation on OLG's behalf and in reliance, engaged Venable as its counsel," *id*. at ¶ 117; Venable "grossly overstaffed the case, failed to take reasonable actions to reduce legal costs, and then overbilled OLG for the services it falsely said were properly rendered," *id*. at ¶ 118; and OLG has been damaged in an amount exceeding $100,000, *id*. at ¶ 119.

This new Fifth Counterclaim repeatedly invokes paragraphs 72 through 99 of the Amended Counterclaim—its Statement of Facts Common to All Counterclaims. With the exception of six new paragraphs (85 to 90), and revision of two others (formerly, 89 and 92;

4

now, 95 and 98), this Statement of Facts Common to All Counterclaims is virtually identical to the original.[3]

The six new paragraphs concern the initial meeting between Venable and OLG, but none of them is material to Venable's Motion. For instance, one alleges that on September 11, 2012, OLG's President and CEO Ernest George Badcock III and its General Counsel Donna M. Zerbo "renewed OLG's concern to obtain the most cost efficient, and timely method to establish" what OLG claimed the Government owed. Doc. 20 ¶ 87.[4] "OLG explained to was prepared [sic] to present all the relevant supporting documents, … [and] that it was prepared to settle amounts due under Count II of the action, using face to face negotiations or arbitration." *Id*. at ¶ 88.[5]

Notably, despite Mr. Badcock's and General Counsel Ms. Zerbo's allegedly expressed desire for cost-efficiency, Doc. 20 ¶ 87, the Amended Counterclaim fails to allege that at any time during OLG's twenty-two-month relationship with Venable either of them ever once confronted Venable about its alleged "gross[ ] overstaff[ing of] the case," *id*. at ¶ 118, or its alleged "fail[ure] to take reasonable actions to reduce legal costs," *id*., or its alleged

---

[3]     To assist the Court in comparing OLG's Counterclaim (Doc. 12) and Amended Counterclaim (Doc. 20), Venable attaches hereto as **Ex. 8** in support of the Motion a "redlined" comparison of the two.

[4]     It is unclear how Mr. Badcock and Ms. Zerbo "renewed" their concern at this meeting, as the Amended Counterclaim does not say when they first made it known to Venable.

[5]     Notwithstanding this professed interest in ADR, Mr. Badcock and Ms. Zerbo "stressed that Wiley Rein's representation was terminated because it had communicated settlement offers with the DOJ attorney without OLG's input or permission." *Id*. at ¶ 90; *but see id*. at ¶ 16 (denying allegation that OLG had decided to replace Wiley Rein because "Wiley Rein had engaged in unauthorized discussions with an attorney from the DOJ about settling the COFC Matter"). OLG does not explain the apparent contradiction between its interest in settlement and its reason for discharging predecessor counsel, except to assert, in a footnote to its Opposition, that its parting with Wiley Rein is not the subject of a ***current*** fee dispute, Doc. 21 at 4 n.4, a fact Venable alleged from the start, *see* Doc. 1 ¶ 19 (alleging that Wiley Rein sued OLG in 2013, and the parties settled the dispute before OLG answered).

"overbill[ing]," *id.*[6] OLG had been embroiled in litigation with the Government since at least "2010." *Id.* at ¶ 82.[7] It had been represented by at least two other law firms in that litigation before turning to Venable. *See* Doc. 15-1 at 4. It also had its own in-house General Counsel, Ms. Zerbo. Doc. 20 ¶ 85. With this background, and its alleged concern over cost, OLG presumably would have tracked its ***third*** law firm's billings and made a record of its immediate objections as they arose; yet the Amended Counterclaim says nothing of this.

In addition to OLG's previous allegations that Mr. Debolt and unnamed others told Mr. Badcock and OLG's General Counsel Ms. Zerbo "that Venable's legal fees and expenses would be kept to a minimum,"[8] *id.* at ¶ 91; and that Mr. Debolt had a "highly favorable [relationship] with federal government officials in order to impress OLG that Venable would achieve a prompt payment of approximately $10 million for OLG," *id.* at ¶ 92, Mr. Debolt is now alleged to have also told Mr. Badcock and Ms. Zerbo that: "achieving OLG's goal of a speedy and efficient method to collect the monies due was his and Venable's specialty," *id.* at ¶ 89; "he personally had achieved this type of goal for other clients," *id.*; and "he could control the actions of the DOJ attorney involved in the case … and keep the case focused on proving, and collecting payment …," *id.*

---

[6]     In fact, the Amended Counterclaim asserts that, rather than "overstaff[ ]" or "overbill[ ]," Venable "performed virtually no work to prepare for the [ADR]. The work of assembling historical and financial data was performed, with no assistance by Venable, by staff members of OLG." Doc. 20 ¶ 93. Having a client assemble "historical and financial data" that the client itself generated is of course one of many "reasonable actions to reduce legal costs" that counsel often employ.

[7]     It is a matter of public record that OLG filed three suits against DoD from 2009 to 2011 arising from the same contract. *See* Doc. 15-1 at 4.

[8]     It is unclear who in particular allegedly made this statement, as the Amended Counterclaim (like the Counterclaim before it) alleges that "Venable" made the statement "[a]cting ***primarily*** through" Mr. Debolt. Doc. 20 ¶ 91 (emphasis added). *See* Doc. 15-1 at 25-26.

Whereas the Counterclaim had previously alleged that "Venable did nothing to secure and collect the $4 million settlement amount" even though "the settlement was reached months earlier," Doc. 12 ¶ 89, the Amended Counterclaim now alleges that

> although the settlement was reached *in principle* months earlier, *Venable did nothing* in the four and one half months between the time the parties came to an agreement [sic] *to expedite the Government's execution of the Settlement Agreement* in order to collect the $4 million settlement amount. OLG was not paid one cent of the funds to which it was entitled while it was represented by Venable and Mr. Debolt before Venable and Debolt were discharged for cause in July 2014.

Doc. 20 ¶ 95 (emphasis added).[9] Of course, OLG never once repudiated the "settlement in principle" before the Settlement Agreement was executed, even though it was free to do so—and if it had, could have pursued the Government for the full amount of its claims.

The Amended Counterclaim also alleges that, before OLG and the Government agreed to pursue ADR, Venable did not heed OLG's urgings on "numerous occasions" that it "go back to the judge to curtail the ongoing discovery that the Government was engaging in and for which OLG knew that Venable was or would be billing OLG." *Id*. at ¶ 98. With this allegation, OLG ignores its own concern with cost-efficiency; for discovery motion practice (which no court likes), would only have increased cost with little assurance of success. OLG also ignores, once again, the public record in the COFC Matter.[10]

In January 2013, not even four months after Venable had substituted its appearance for

---

[9]     The actual amount of time between the recommendation of settlement in April 2014 and Venable's firing in mid-July 2014 was closer to two-and-a-half months. *See* Doc. 15-1 at 8 (quoting *Suit III*, Doc. 117); *see also*, *infra* at 13.

[10]     OLG did not oppose or otherwise respond to Venable's Request for Judicial Notice (Doc. 15-10); nor does it dispute any of the facts of record cited in Venable's Supporting Memorandum. Though it baldly asserts that Venable has somehow mischaracterized its pleading or "misled" the Court, OLG fails to provide a single example. *See* Doc. 21 at 1 ("movant's selective description of the challenged pleading"); *id*. at 3 ("Venable's misleading gloss").

Wiley Rein's, the COFC Matter (also known as "*Suit III*") had already been pending for nearly two years. The parties had a history, which the Court of Federal Claims recounted in a January 31, 2013, Order granting the Government more time to respond to a motion OLG had filed:

> plaintiff [viz., OLG] has filed a motion for partial summary judgment on Count II. Defendant [viz., the Government] requests an extension of time to respond until after the completion of discovery because, it asserts, plaintiff has "consistently tried to avoid disclosing information to the fullest practicable extent."
>
> We have no basis for evaluating defendant's complaints regarding plaintiff's level of cooperation in discovery. ***The parties should be aware that no judge is likely to permit trial if, for example, defendant charges that it is not prepared because plaintiff has been stonewalling discovery.*** If counsel could make such a showing, plaintiff would accomplish only further delay that typically would not serve plaintiff's interests.

*Suit III*, Doc. 74 (emphasis added). Deciding when and how to approach a court about discovery requires an attorney's exercise of professional judgment in weighing the risks and benefits of such action, especially where, as here, that discovery concerned a motion OLG had filed, and the client had (allegedly) expressed concern with moving the case along. *See* Doc. 20 ¶ 89. OLG's Amended Counterclaim ignores this fundamental truth.

The final addition that the Amended Counterclaim makes is to append, as an exhibit, a letter from an attorney with no apparent U.S. Government-contracting experience, which more or less repeats the same litany of labels, characterizations, and conclusory adjectival phrases that the Amended Counterclaim (and before it, the Counterclaim) passed off as a purportedly "independent analysis of all of Venable's billings …." Doc. 20-1; *compare id. with* Doc. 20 ¶ 99.[11] This is discussed in more detail below. *See infra* at 14-15.

---

[11] There is more hedging in Document 20-1 than in either the Counterclaim or Amended Counterclaim. For instance, what "seems" to be, according to the author of Document 20-1, becomes fact in the eyes of OLG. *Compare* Doc. 20-1 at 2 (work referenced in item 2 "seem[s] to be duplicative") *with* Doc. 12 ¶ 93 & Doc. 20 ¶ 99 (same work is "routinely duplicat[ive]").

### III. <u>Argument</u>

**A.  OLG's Opposition Seeks to Resurrect the *Conley* Formulation.**

The Motion relies, in part, on the uncontroversial "plausibility" standard of pleading first articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and then amplified two years later in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).[12] Venable's Supporting Memorandum does not so much as mention *Conley v. Gibson*, *supra*—and for good reason— because *Twombly* "retired" *Conley*'s oft-misunderstood formulation that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 563; *see id*. at 561 (quoting *Conley*, 355 U.S. at 45-46).[13]

Curiously, OLG's Opposition starts by citing *Conley*'s formulation, and insisting that "[n]othing in [*Twombly* and *Iqbal*] alters these long-standing principles." Doc. 21 at 2 (quoting *Browning v. Clinton*, 293 F.3d 235, 242 (D.C. Cir. 2002) (citing *Conley*, 355 U.S. at 45-46)). OLG's Opposition reprises this theme later, when it says "nothing in the Supreme Court's *Twombly* and *Iqbal* decisions has undercut the classic formulation of the Court's paradigmatic 1957 decision in *Conley v. Gibson*, …" *Id*. at 8 (quoting *Conley*, 355 U.S. at 45-46). Under *Conley*, OLG insists, whatever a pleading lacks may be provided by discovery. *Id*. (quoting *Conley*, 355 U.S. at 47-48).

---

[12]     In its first decision to discuss *Twombly*'s import, the D.C. Circuit said that "it has never been literally true, as *Twombly* noted, that a complaint is adequate unless 'no set of facts' consistent with the complaint could support a claim." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 528 F.3d 8, 16 n.4 (D.C. Cir. 2008) (citing *Twombly*, 550 U.S. at 561-64 (citing *Conley*, 355 U.S. at 45-46)).

[13]     *Twombly* points out that courts more often than not misunderstood *Conley*: "To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief." *Twombly*, 550 U.S. at 562-63.

To the extent courts ever viewed *Conley*'s "no set of facts" formulation as the standard for evaluating motions to dismiss, both the Supreme Court and the D.C. Circuit have made it clear that *Conley*'s time had come and gone. In *Twombly*, a 7-2 majority "retired" *Conley*'s "no set of facts" formulation: "***The phrase is best forgotten*** as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563 (emphasis added). *Twombly* also retired any notion that a pleading's inadequacies may be sorted out later in discovery: "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management,' …." *Id.* at 559.   Justice Stevens, in dissent, understood the import of the majority's decision: "Today, … the Court scraps *Conley*'s 'no set of facts' language. … If *Conley*'s 'no set of facts' language is to be ***interred***, let it not be without a eulogy." *Id.* at 576 (Stevens, J., dissenting) (emphasis added). To the extent it has any relevance today, *Conley*'s formulation is best understood, not as the standard of pleading itself, but as applying only once a pleading has already been found to state a plausible claim for relief. *Twombly*, 550 U.S. at 563 ("*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."). Any other understanding, such as *Browning*'s (or OLG's), is "misplaced," because "the Supreme Court ***abrogated*** the *Conley* formulation in *Twombly*.…" *Jones v. Horne*, 634 F.3d 588, 596 n.4 (D.C. Cir. 2011) (citing *Twombly* and *Conley*) (emphasis added).

OLG seeks to resurrect *Conley*, and urge this Court to allow it 'the liberal opportunity for discovery' of which *Conley* spoke, Doc. 21 at 8 (quoting *Conley*), for precisely the reason the Supreme Court in *Twombly* decided it was time to bury *Conley*:

> This "no set of facts" language can be read in isolation as saying that any statement revealing the *theory* of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings. ...
>
> On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery.

*Twombly*, 550 U.S. at 561. Indeed, each of the cases OLG's Opposition cites, without elaboration, for the proposition that the Counterclaim—and, presumably, the Amended Counterclaim—states "plausible" claims, *see* Doc. 21 at 8-9 (citing cases), is a pre-*Twombly* decision that relies on *Conley*'s now-abrogated formulation. *See Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (citing *Conley*); *Caribbean Broadcasting System., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1084 (D.C. Cir. 1998) (same); *Atchinson* [not "*Atkinson*"] *v. D.C.*, 73 F.3d 418, 422 (D.C. Cir. 1996) (same); *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C. Cir. 1983) (same).[14]

Even if, *arguendo*, these cases did support an argument that the Counterclaim or the Amended Counterclaim would survive under the "no set of facts" formulation, *Conley* is, as Justice Stevens in dissent implied, dead and buried. *A fortiori*, the decisional authority cited by OLG, at least to the extent it relies on *Conley*, is also dead and buried.

For the reasons previously articulated in the Supporting Memorandum, it is not enough to assert conclusory generalizations based on labels, characterizations, and adjectival phrases rather

---

[14]     Being pre-*Twombly* cases, none of these cases discusses "plausibility." Leaving this fact aside, it is unclear why OLG claims these cases—cited following a "*see*" signal—clearly support the plausibility of its causes of action; for none has anything to do with breach of contract, fraudulent inducement, professional negligence, breach of fiduciary duty, "gross overbilling," or (in the case of the Amended Counterclaim) negligent misrepresentation. *See Krieger*, 211 F.3d at 164-65 (alleging defamation, interference with contract, and Privacy Act violation); *Caribbean Broadcasting System*, 148 F.3d at 1082 (alleging Sherman Act and Lanham Act violations); *Atchinson*, 73 F.3d at 419 (alleging § 1983 violations); *Sinclair*, 711 F.2d at 292 (alleging violations of unspecified "constitutional and statutory rights").

than facts. Yet the Amended Counterclaim, like its predecessor, does just that, and only that. Accordingly, all causes of action of the Amended Counterclaim should be dismissed with prejudice.

### B. OLG Does Not Respond to Venable's Arguments As to Lack of Duty, Causation, and the Conclusory Nature of Its Allegations.

As previously discussed, where a party asserts a claim for legal negligence and other claims that restate the negligence claim in tort or contract form, under D.C. law the other claims must generally reach the same result as the negligence claim; failure of the negligence claim thus means failure of the other claims. Doc. 15-1 at 15 (citing *Macktal v. Garde*, 111 F. Supp. 2d 18, 22-23 (D.D.C. 2000) (discussing *O'Neil v. Bergan*, 452 A.2d 337, 342-43 (D.C. 1982), and *Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1190 (D.C. 1986))).

Aside from asserting, in conclusory fashion, that OLG's non-fraud claims are "plausible" or "adequately pled," and that its fraud claim satisfies Rule 9(b), OLG's Opposition does not respond to any of Venable's arguments for dismissal. Three of these arguments in particular demonstrate why OLG cannot state a claim.

First, OLG's claims—chiefly, it seeks $6 million in damages that it allegedly "sustained when it was forced to accept only $4 million of the $10 million owed by the Government …," Doc. 21 at 12—rely on the legally flawed premise that attorneys owe their clients a duty to ensure complete victory. That is not the law. Due to the inevitable uncertainty of litigation, an attorney has no duty to insure or guarantee the most favorable outcome possible. Doc. 15-1 at 20 (quoting *Simko v. Blake*, 532 N.W.2d 842, 846-47 (Mich. 1995)). As a matter of law, Venable did not owe OLG a duty to recover 100 percent of the damages OLG claimed.

Second, even if, *arguendo*, a duty to ensure complete victory existed, the sole proximate cause of the damage OLG now claims was its own voluntary decision to accept payment of

$4,160,000 **plus** the Government's release of its claim for $2,084,236 under the Final Decision, in full and final settlement of the parties' dispute. OLG's Opposition says nothing in response, and for good reason. Perhaps OLG might have recovered more had it elected to try its claims; perhaps it might have recovered less. Undoubtedly, it would have incurred additional legal fees and expenses through the retention of successor counsel, but how much is unknown. We will never know whether OLG's net recovery would have been different because OLG chose to proceed with settlement.

Part IV.B.2 of Venable's Supporting Memorandum demonstrated that as of August 7, 2014, when OLG first sued Venable in New York State Supreme Court for the very same alleged wrongs asserted here, OLG had offered to settle with DoD, but the offer had not yet been accepted. That acceptance did not come until September 12, 2014, nearly two months after OLG had fired Venable and over a month after OLG had sued Venable in New York. *See* Doc. 15 at 17-20; Doc. 15-3 (Mot. **Ex. 1**); Doc. 15-4 (Mot. **Ex. 2**).[15]

Between April 8, 2014, when OLG offered to settle with the Government, and September 12, 2014, when the Government accepted that offer and executed the Settlement Agreement (Doc. 15-3, Mot. **Ex. 1**), OLG could have withdrawn its offer at any time. *Vogel v. Touhey*, 828 A.2d 268, 289 (Md. Ct. App. 2003) (citations omitted) (where "a written settlement agreement is contemplated, there is no settlement until the written agreement is executed").[16] It did not withdraw that offer, however. It steadfastly refused to do so. *See* Doc. 15-7 (Mot. **Ex. 5**) ("If, as you assert …, OLG is dissatisfied …, it need only notify the DOJ of its asserted dissatisfaction

---

[15]     There were seven exhibits filed with the Motion, as Docs. 15-3 through 15-9.

[16]     In the absence of controlling District of Columbia authority directly on point, courts applying District law "may give Maryland law special attention because the District was carved out of Maryland and derives its common law from that state." *See Hickey v. Scott*, 796 F. Supp. 2d 1, 4 n.3 (D.D.C. 2011) (citations and internal quotations omitted).

and revoke or withdraw any offer of settlement."); Doc. 15-8 (Mot. **Ex. 6**) ("OLG will not and cannot revoke it."). In fact, when Venable suggested that OLG should just back out and withdraw an offer that allegedly represented damage to OLG, OLG's response was to threaten to amend its New York State Supreme Court complaint (Doc. 15-5, Mot. **Ex. 3**) "to seek punitive damages," and then to "present appropriate claims for disciplinary action" against Venable. Doc. 15-8 (Mot. **Ex. 6**).

OLG ***wanted*** the settlement, and therefore voluntarily abandoned any recovery greater than the settlement amount. *See Guinn v. Raymond*, 88 P.3d 807 (Kan. Ct. App. 2004) (plaintiff deemed to have abandoned her claim where she settled rather than give the trial court the opportunity to right a perceived wrong). To paraphrase *Vogel*, by consciously and deliberately deciding to go through with the settlement after firing Venable and before the offer had been accepted by the Government, OLG "set up the scenario for a malpractice claim … that might otherwise have been avoided." *Vogel*, 828 A.2d at 718-19. Regardless of the cause of action alleged, therefore, OLG caused the $6 million of harm it allegedly suffered.

Finally, OLG places great stock in the exhibit attached to its Amended Counterclaim (Doc. 20-1). But that exhibit (the Malafi Letter"), and Paragraph 99 of the Amended Counterclaim more or less say the same thing. Both use the same or similar conclusory adjectival phrases. *Compare* Doc. 20-1 at 2-4 ("exorbitant"; "excessive" (used twice); "a lot of" (used six times); "a great number" or "a great deal" (used three times) *with* Doc. 20 ¶ 99 ("exorbitant"; "excessive" (used four times); "incessant" (used twice); "gross" or "grossly" (used twice);

"extraordinary"; "unjustifiable" or "unjustifiably" (used three times); "substantial"; "useless").[17]

As this Court's decision in *Carter v. Bank of America*, *N.A.*, demonstrates, where a pleading's

allegations are inadequate, attempting to shore them up on the strength of an "expert, certified,

forensic" report will not stave off dismissal. *See* 888 F. Supp. 2d 1, 8 n.8.[18] The Malafi Letter, in

short, changes nothing about OLG's conclusory, inadequate allegations of alleged overbilling.

OLG's Amended Complaint does not meet OLG's "obligation to provide the grounds of [its]

entitlement to relief [rather] than labels and conclusions…."*Simms v. D.C.*, 699 F. Supp. 2d 217,

222 (D.D.C. 2010) (citing *Twombly*, 550 U.S. at 545).

### C. OLG's Amended Counterclaim Fails to State a Fraud, or, for That Matter Negligent Misrepresentation, Claim.

The Amended Counterclaim purports to provide additional detail concerning Venable's

alleged fraud, and to state a new claim for negligent misrepresentation. Mr. Debolt or unnamed

others acting on behalf of Venable allegedly made the following six misrepresentations, either

fraudulently or negligently:

1. "achieving OLG's goal of a speedy and efficient method to collect the monies due was his and Venable's specialty," Doc. 20 ¶ 89;

2. "he personally had achieved this type of goal for other clients," *id.*;

---

[17]     Paragraph 93 and the Malafi Letter even make the same mistakes. *Compare* Doc. 20-1 at 3 *with* Doc. 20 ¶ 99 (concerning the alleged billing of "1-2" or "2" hours to greet people for two depositions). Venable's billing statement from June 2013, which is an integral document to which Paragraph 99 of the Amended Counterclaim refers and therefore properly before the Court, *George v. Bank of America N.A.*, 821 F. Supp. 2d 299, 301 (D.D.C. 2011) (citation omitted), demonstrates that both the Malafi Letter and OLG's pleading mistakenly focus on a typographical error rather than the time actually billed. *See* Doc. 15-1 at 11 n.6.

[18]     In fact, the Malafi Letter appears to have been drafted to be a negotiating tool. It repeatedly advises OLG's General Counsel, Ms. Zerbo, on what OLG should "point[ ] out," "question," "or "ask" about in order to reduce OLG's debt to Venable. Doc. 20-1 at 2-4. And, the author repeatedly admits what she "do[es]n't know" and that she cannot "be more specific" without "further information." *Id*. at 4.

3. he had a "highly favorable [relationship] with federal government officials in order to impress OLG that Venable would achieve a prompt payment of approximately $10 million for OLG," *id*. at ¶ 92; [19]

4. "he could control the actions of the DOJ attorney involved in the case," *id*. at ¶ 89;

5. "he could "keep the case focused on proving, and collecting payment…," *id*.; and

6. "Venable's legal fees and expenses would be kept to a minimum," *id*. at ¶ 91.[20]

Under D.C. law, "generalized statements of optimism that are not capable of objective verification" are puffery, not actionable misrepresentations.[21] *S.E.C. v. E-Smart Technologies, Inc.*, 2014 WL 6612422, *12 (D.D.C. 2014) (quoting *Freeland v. Iridium World Comm., Ltd.*, 545 F. Supp. 2d 59, 76 (D.D.C.2008)); *Shah v. GenVec, Inc.*, 2013 WL 5348133, *15 (D. Md. 2013) (vague and general statements of optimism are understood to be nothing more than puffery). Examples of puffery include:

1. statements about what is "cost effective," "sound," "smart," or "efficient," *In re XM Sat. Radio Holdings Secs. Litig.* ("*In re XM*"), 479 F. Supp. 2d 165, 179-80 (D.D.C. 2007) (alleged misrepresentation about a "'cost effective growth strategy' was merely puffery-*i.e.*, it was so vague and incapable of objective verification as to be immaterial as a matter of law," reflecting "a relative and subjective judgment" that can "neither be quantified nor specified in any way") (citation and internal quotation marks omitted);

2. marketing a property as a "gorgeous renovation," *Jefferson v. Collins*, 905 F. Supp. 2d 269, 283 (D.D.C. 2012) ("This alleged statement, however, cannot form the predicate for a fraud claim because it is a 'is a classic example of commercial puffery on which no

---

[19] This statement was allegedly made "in order to impress OLG that Venable would achieve a prompt payment of approximately $10 million for OLG." Doc. 12 ¶ 86; Doc. 20 ¶ 92. Needless to say, an intent "to impress" is not an intent to deceive.

[20] More correctly, these six alleged misrepresentations appear to be descriptions or paraphrases of what Mr. Debolt or others allegedly said, not the statements themselves. *See Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 29 (D.D.C. 2007) (referring to alleged statements that were "only described rather than quoted in plaintiff's complaint").

[21] This Court has defined "puffery" as "'the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined.'" *Whiting v. AARP*, 701 F. Supp. 2d 21, 30 n.7 (D.D.C. 2010) (citation omitted).

16

reasonable person would rely.'") (quoting *Pearson v. Chung*, 961 A.2d 1067, 1076 (D.C. 2008) (internal quotation marks omitted) (other citations omitted);[22]

3. a restaurant's claim that it serves the "best food," *Hoyte*, 489 F.Supp.2d at 30 ("KFC's claims that its restaurants serve the 'best food' is a non-measurable, 'bald statement of superiority' that is non-actionable puffery.");

4. statements about one's competence to perform a certain kind of work, Doc. 15-1 at 27 (citing *Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc.,* 188 F. App'x 966, 968–69 (11th Cir. 2006)); and

5. Statements about one's relationship with others, *id.* (citing *Gold v. Univ. of Bridgeport School of Law*, 562 A.2d 570, 573 (Conn. App. Ct. 1989) (citation omitted) (law school dean's recruiting statement that "'friendly interaction ... existed between the students and the instructors'" did not give rise to fraudulent misrepresentation claim because it was "mere 'puffing,'" and "[s]uch 'favorable comments by sellers with respect to their products, are universally accepted and expected in the market place' and do not give rise to liability").

Moreover, "'a prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence.'" *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 111 (D.D.C. 2013) (quoting *Bennett v. Kiggins,* 377 A.2d 57, 61 (D.C. 1977)). The fact that statements about future events are not ultimately borne out "does not in and of itself support an inference that [the speaker] was being untruthful." *In re XM*, 479 F. Supp. 2d at 179. To be actionable, a statement as to future events must be made without the intention to perform or with knowledge that the events will not occur. *Va. Acad. of Clinical Psychologists v. Group Hospitalization and Med. Svcs.*, *Inc.*, 878 A.2d 1226, 1234-35 (D.C. 2005).

"Unless the present state of mind is misstated, there is of course no misrepresentation. … The mere breach of a promise is never enough to establish the fraudulent intent. It may, however be inferred from the circumstances …." W. Page Keeton, *Prosser & Keeton on The Law of Torts*

---

[22] Puffery is nonactionable regardless of whether fraud or negligent misrepresentation is alleged. *See*, *e.g.*, *Jefferson*, 905 F. Supp. 2d at 283-84 (dismissing fraud and negligent-misrepresentation claims because both based on puffery).

§ 109, at 764-65 (5th ed.1984) (footnotes omitted). There must, of course, be specific facts alleged to support this inference. *Carter*, 888 F. Supp. 2d at 14 ("the Court 'need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint….'") (citations omitted).

To assert a claim in the District of Columbia for negligent misrepresentation, a claimant must "successfully plead"—i.e., plead facts establishing—that  (1) the opponent made a false statement or omission of a fact; (2) the statement was a violation of a duty to exercise reasonable care; (3) the false statement or omission involved a material issue; (4) the claimant reasonably relied to its detriment on the false information; and (5) the opponent's challenged conduct proximately caused the claimant's injury. *Simms*, 699 F. Supp. 2d at 226 (citations omitted).

Like fraud claims, negligent-misrepresentation claims are subject to the requirements of Federal Rule of Civil Procedure 9(b). *Id.* (citations omitted).[23] Rule 9(b) "aims to prevent a claim filed as a 'pretext for the discovery of unknown wrongs.'" *Id.* (quoting *Kowal v. MCI Comm. Corp.,* 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)).

Under these principles, none of the six statements allegedly made by Mr. Debolt or unnamed others, *see supra* at 15-16, is an actionable fraudulent or negligent misrepresentation. The first, third, fourth, fifth, and sixth—whether speaking of "a speedy and efficient method"; or of what Mr. Debolt's "specialty" is; or of a "highly favorable" relationship; or of "control[ling]" an adversary; or of "keep[ing] the case focused" and fees and expenses "to a minimum"—are all puffery; i.e., generalized, optimistic statements incapable of objective verification, expressing only relative, subjective judgments. *In re XM*, 479 F. Supp. 2d at 179-80. And, because the first

---

[23]     While the parties in *Hoyte* disagreed about whether Rule 9(b) applied to the plaintiff's negligent-misrepresentation claim, the Court noted that "in this case it doesn't matter." 489 F. Supp. 2d at 29. The same may be said here.

18

alleged statement about "a speedy and efficient method" is puffery, the second—that Mr. Debolt had "achieved" "speedy and efficient … collect[ion of] monies due"—also cannot be actionable. There is not, moreover, any factual averment showing the falsity of any statement at the time it was made.

Claims of fraud and negligent misrepresentation must allege reasonable reliance. *Malek v. Flagstar Bank*, ___ F. Supp. 3d ___, 2014 WL 4804217, *5 (D.D.C. Sept. 29, 2014) (reasonable reliance is a "critical element" of common-law fraud claim); *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 254 (D.D.C. 2004) (negligent-misrepresentation claim requires reasonable reliance). All six statements alleged, however, by their very nature as puffery, preclude reasonable reliance. *Whiting*, 701 F. Supp. 2d at 30 n.7 (quoting *Margolis v. U–Haul Int'l Inc.,* Case No.2007 CA 005245 B, slip op. at 19–20, 2009 WL 5788369 (D.C. Super. Ct. Dec. 17, 2009)).

The fourth alleged misrepresentation, the extraordinary allegation that Mr. Debolt said "he could control the actions of the DOJ attorney involved in the case," illustrates the absence of reasonable reliance here. Even if reliance on this alleged statement was not unreasonable on its face—it is, because no one can be said to reasonably rely on another's ability to control an adversary—OLG had particularly good reason not to have relied. Having already spent more than two years litigating against the Government represented by two other law firms, OLG—particularly its General Counsel Ms. Zerbo—had to have known that opposing counsel at the DoJ were not mindless automatons subject to remote control by Mr. Debolt or anyone else. It is unreasonable as a matter of law to believe—if indeed Mr. Badcock and his in-house lawyer Ms. Zerbo did believe—that an attorney can "control" an adversary.

Even if the six alleged statements allegedly were not borne out—whether because Venable "grossly overstaffed the case" or "failed to take reasonable actions to reduce legal costs," Doc. 20 at ¶ 118, or for some other reason—this does not support an inference that Mr. Debolt was being untruthful when he allegedly made them. *In re XM*, 479 F. Supp. 2d at 179. The Amended Counterclaim, like the Counterclaim before it, alleges no facts to support an inference of fraudulent intent. *Intelsat USA Sales Corp.*, 935 F. Supp. 2d at 111; *Carter*, 888 F. Supp. 2d at 14. There is no actionable "fraud by hindsight." *In re XM*, 479 F. Supp. 2d at 176 ("[T]here is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false.") (internal quotation marks and citation omitted).

In short, for multiple reasons, the Amended Counterclaim's Second and Fifth Counterclaims fail to satisfy Rule 9(b). Both should, accordingly, be dismissed.

## IV.   <u>Conclusion</u>

When confronted with the insurmountable deficiencies of its claims, OLG sought to turn back the clock so that it might get past the Motion and hope for the chance to dig up something it could use in discovery. *See* Doc. 21 at 8 (quoting *Conley*, 355 U.S. at 47-48). This, however, is a tactic expressly rejected by the Supreme Court in *Twombly*, 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management,'"), and by the D.C. Circuit in *Kowal*, 16 F.3d 1271 at 1279 n.3 (Rule 9(b) aims to prevent claims filed as a "pretext for the discovery of unknown wrongs"). *See Shields v. Wash. Bancorp.*, 1992 WL 88004, at *4 (D.D.C. Apr. 7, 1992) (citing *Kowal*, and invoking Rule 9(b) as a means to protect against attacks on a

party's reputation where the claim for fraud is unsubstantiated, and to prevent "strike suit[s] brought solely for [their] settlement value").

OLG has now had two chances to plead its claims. Its efforts to resurrect *Conley*, *supra*, reframe its fraudulent-inducement claim, and slip in a negligent-misrepresentation claim, on the strength of generalized, subjective expressions of optimism, demonstrate how desperate OLG is, and how futile amendment has been. For the foregoing reasons, Venable therefore asks that the Court grant its Motion, and dismiss the Amended Counterclaim with prejudice.

Respectfully submitted,

Dated: June 19, 2015

_____/s/_____
Andrew Gendron (D.C. Bar #: 471159)
*Agendron@venable.com*
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7439

*Attorney for Plaintiff/Counter-Defendant Venable
LLP and Counter-Defendant Paul A. Debolt, Esq.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 19th day of June, 2015, I caused a copy of the foregoing paper to be served on counsel of record via the Court's CM/ECF system.

_____/s/_____
Andrew Gendron